**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY, and MEDIVERSAL, INC.<br>　　　　Plaintiffs/Counter-Defendants,<br><br>　　v.<br><br>AMERICAN ECONOMY INSURANCE COMPANY, and COLORADO CASUALTY INSURANCE COMPANY.<br>　　　　Defendants. | Case No. 2:11-cv-02082-APG-CWH<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR DECLARATORY JUDGMENT**<br><br>(Dkt. #198) |

　　　　Plaintiff Mediversal Inc.[1] is a healthcare-management company. It selects and manages a network of healthcare providers, ensures the quality of those providers, and provides its network to self-insured companies that do not have a network of their own. Mediversal provided its network and management services to Coast Casinos. One of Coast Casino's employees contracted Hepatitis C while being treated at the Endoscopy Center of Southern Nevada ("ECSN"), a provider in Mediversal's network. The employee sued Mediversal in state court, alleging it was liable because it reviewed, supervised, and approved ECSN as a network provider. Mediversal settled the litigation.

　　　　Mediversal then filed this lawsuit seeking indemnification for the settlement under two commercial general liability insurance policies it purchased from defendants American Economy

---

[1] Mediversal was a subsidiary of plaintiff Great-West Life and Annuity Insurance Company until Great-West transferred Mediversal to another insurer in 2008. (Dkt. #13 at ¶¶ 8-9.) Although it no longer owns Mediversal, Great-West alleges it retained rights related to third-party claims against Mediversal and is therefore a proper plaintiff in this case. (*Id.* at ¶27-28.) I need not address whether Great-West is a proper party at this time because the services that gave rise to Mediversal's liability were professional and thus excluded under the policies at issue.

Insurance Company and Colorado Casualty Insurance Company. Defendants now move for a declaration that those policies provide no coverage. They argue Mediversal's liability in the state litigation arose from its professional services and that those services are expressly excluded in the CGL policies.

I agree with the defendants that the services that gave rise to Mediversal's liability were professional and thus excluded under the CGL policies. Defendants are entitled to a declaratory judgment on this issue.

When seeking judgment on their first counterclaim, defendants also request that I declare that there was no triggering occurrence, that the covenant of good faith and fair dealing has not been breached, that there is no basis for punitive damages, and that defendants had no duty to defend.[2] Defendants also request judgment in their favor on plaintiffs' third and fourth causes of action for breach of contract.[3] Defendants further argue that all of plaintiffs' remaining claims must fail if there is no coverage under the policies.[4] But the parties' papers related to this motion address only whether the professional services exclusion was triggered, not the impact of such a finding. In a separate Order, I will further address defendants' request for judgment on the remainder of its first counterclaim and all of plaintiffs' claims.

**I.      BACKGROUND**

   **A.      The underlying claim at issue**

Mediversal is a healthcare-management company. It selects and manages a network of healthcare providers, ensures the quality of those providers, and provides its network to insurers and self-insured companies that do not have a network of their own.

---

[2] (Dkt. ##198 at 3-4; 16 at ¶66.)

[3] (Dkt. #198 at 4.)

[4] (*Id.*)

Mediversal provided a network and healthcare-management services to Coast Casinos. Mediversal did not manage the healthcare of individual plan participants, but it reviewed provider credentials and carried out other quality assurance and utilization-review activities for Coast.[5] Among other services provided to Coast, Mediversal:

1. Reviewed the credentials and licenses of its participating providers to ensure they "maintain credentials in accordance with the requirements and standards set forth in [Mediversal's] standard credentialing procedures and agreements with Participating Providers";

2. Conducted quality assurance by "require[ing] its Participating Providers to participate in [Mediversal's] Utilization Management/Disease Management and Case Management, and [to] cooperate with [Mediversal's] Quality Assurance Programs"; and,

3. Preauthorized outpatient surgery and non-emergency hospital admissions. Mediversal's contract with Coast stated that "[u]pon receiving all appropriate clinical documentation, the preauthorization will be denied or approved based upon reasonable standards of Medical Necessity."

ECSN, a Mediversal provider, was named in a series of lawsuits stemming from its reuse of syringes during medical procedures. Nguyen and Thuy Huynh were employees of Coast Casinos and contracted hepatitis C while being treated at ECSN. Huynh sued Mediversal. Huynh alleged that, as a healthcare-management service, Mediversal monitored, supervised, and evaluated ECSN and was thus liable for ECSN's malpractice.[6] Mediversal settled the Huynh litigation and seeks indemnification for the settlement under its CGL policies.

/ / / /

/ / / /

/ / / /

---

[5] (Dkt. #198, Ex. 2, at 2935-2938.)

[6] For example, Huynh alleged that "Through quality assurance Defendants must direct, evaluate, and monitor the effectiveness of health care services provided by the contracted providers." (Dkt. 13, Ex. 6.)

### B. The CGL policies

Defendants issued two CGL policies to Mediversal.[7] These policies were in effect during the time periods relevant to the Huynh litigation, and covered general business liabilities such as injuries in Mediversal's offices, damage to Mediversal's personal property, and hired-auto accidents.[8] The CGL Policies exclude liability for Mediversal's "professional services," defined as:

> "Bodily injury", "property damage", "personal and advertising injury" caused by the rendering or failure to render any professional service. This includes but is not limited to:
>
> (1) Legal, accounting or advertising services;
> (2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
> (3) Supervisory, inspection or engineering services;
> (4) Medical, surgical, dental, x-ray, or nursing services treatment, advice or instruction;
> (5) Any health or therapeutic service treatment, advice or instruction;
> (6) Any service, treatment, advice or instruction for the purpose of appearance or skin enhancement, hair removal or replacement or personal grooming;
> (7) Optometry or optical or hearing aid services including the prescribing, preparation, filing, demonstration or distribution of ophthalmic lenses and similar products or hearing aid devices;
> (8) Body piercing; and
> (9) Services in the practice of pharmacy.[9]

## II. LEGAL STANDARD - SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[7] (Dkt. 13, Ex. 1, Ex. 2.)

[8] (*Id.*)

[9] (*Id.*)

law."[10]  For summary judgment purposes, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[11]

If the moving party demonstrates the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[12]  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[13]  He "must produce specific evidence, through affidavits or admissible discovery material, to show" a sufficient evidentiary basis on which a reasonable fact finder could find in his favor.[14]

A party seeking to either support or refute the assertion of a fact in a summary judgment context must do so with admissible evidence.[15]  As the summary judgment procedure is the pretrial functional equivalent of a directed-verdict motion, it requires consideration of the same caliber of evidence that would be admitted at trial;[16] thus, it is insufficient for a litigant to merely attach a document to a summary judgment motion or opposition without affirmatively demonstrating its authenticity.

---

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[11] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[13] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).

[14] *Bhan v. NME Hosps.*, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[15] Fed. R. Civ. Proc. 56(c)(1); *Orr*, 285 F.3d at 773; *Harris v. Graham Enterprises, Inc.*, 2009 WL 648899, at *2 (D. Ariz. Mar. 10, 2009) (applying *Orr* to prima facie case in employment discrimination matter).

[16] *Anderson*, 477 U.S. at 251 (citing *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983)).

### III. **DISCUSSION**

Plaintiffs first argue the professional services exclusion is ambiguous and that, in any event, its relevant activities leading to liability do not fall within the exclusion. Second, plaintiffs argue that, even if some of its activities were professional, some of Mediversal's activities were non-professional, and coverage should therefore exist.

#### A. **Whether the professional services exclusion is ambiguous**

"In the absence of ambiguity . . . contract interpretation presents a question of law that the district court may decide on summary judgment."[17] "Whether a contract is ambiguous likewise presents a question of law."[18] "Ambiguity does not arise simply because the parties disagree on how to interpret their contract,"[19] and broad terms are not necessarily ambiguous.[20] A provision in an insurance policy is ambiguous only "if it is reasonably susceptible to more than one interpretation."[21] In other words, "an ambiguous contract is 'an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." Further, in Nevada, trade custom and usage may inform a court's determination of ambiguity.[22]

CGL polices frequently exclude coverage for "professional services," and, as noted by the Ninth Circuit, "courts have held . . . professional liability exclusions to be unambiguous and

---

[17] *Galardi v. Naples Polaris, LLC*, 129 Nev. Adv. Op. 33, 301 P.3d 364, 366 (2013) (citations omitted).

[18] *Id.*

[19] *Id.*

[20] *See Powell,* 252 P.3d at 674 (noting that anti-concurrent clauses in insurance policies are often broad, but such clauses are valid so long as they are sufficiently clear).

[21] *Id.* (internal quotation marks omitted).

[22] *Galardi,* 301 P.3d at 367.

enforceable where 'professional services' are undefined."[23]  "Professional services" are services requiring "specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual."[24]  Like other courts, I find "professional services" in the CGL policies at issue not reasonably susceptible to more than one meaning.  The CGL policies covered general property damage, personal injuries, and other general liabilities.  They did not cover liabilities arising from Mediversal's professional healthcare-management services.  The term, at least at it is used in these policies, is unambiguous.

B. **Whether Mediversal's services fall under the professional services exclusion**

Professional services "must arise out of acts particular to the individual's specialized vocation, [and] . . . it must be necessary for the professional to use his specialized knowledge or training."[25]  Examples of professional services include the provision of medical services, legal services, escrow services, and financial advice.[26]  Each of these services requires specialized knowledge and training.  The correct inquiry is whether the act giving rise to liability was professional in nature; the title of the actor is irrelevant.[27]

---

[23] *Shepardson Eng'g Associates, Inc. v. Cont'l Ins. Companies,* 21 F.3d 1115 (9th Cir. 1994).

[24] *N. Counties Eng'g, Inc. v. State Farm Gen. Ins. Co.,* 224 Cal. App. 4th 902, 931 (2014); *Rupracht v. Certain Underwriters at Lloyd's of London,* No. 3:11-CV-00654-LRH, 2012 WL 4472158 (D. Nev. Sept. 25, 2012).

[25] *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 425 (5th Cir. 2010).

[26] *See, e.g., Rupracht,* 2012 WL 4472158; *Tradewinds Escrow, Inc. v. Truck Ins. Exch.,* 97 Cal. App. 4th 704, 713 (2002); *Hollingsworth v. Commercial Union Ins. Co.,* 208 Cal. App. 3d 800, 807 (1989).

[27] *First Ins. Co. of Hawaii v. Cont'l Cas. Co.,* 466 F.2d 807, 810 (9th Cir. 1972).

Plaintiffs first argue the acts which gave rise to liability were ESCN's use of dirty needles, an ordinary negligent act not involving professional services.[28] But the relevant act here is Mediversal's services, not ECSN's. Mediversal's liability stemmed from the services it provided to Coast Casinos, which included selecting, reviewing, and ensuring the quality of medical providers.

Plaintiffs next argue Mediversal merely carried out "administrative services" not envisioned by the professional services exclusion. Plaintiffs also argue that monitoring or supervising another is categorically a non-professional activity. I disagree. Huynh alleged in the underlying litigation which gave rise to liability that Mediversal was liable because it supervised and monitored contracted providers to ensure they were using reasonable medical treatment practices.[29] Mediversal employed trained professionals, such as nurses, to determine whether ECSN's providers, and healthcare services and policies, were adequate.[30] These credentialing, utilization review, and quality assurance activities require specialized training and knowledge in healthcare. If no specialized expertise, knowledge, or training was required, there would be little advantage to hiring Mediversal and using its network of providers. Like the provision of escrow services, financial advice, or medical care, Mediversal's relevant services require specialized

---

[28] Plaintiffs argue defendants should be bound to their expert's admission that genuine disputes of fact exist as to the meaning of "professional services." But an expert's admission as to a legal issue, in deposition, does not necessarily bind a party. Plaintiffs similarly argue I should consider the fact that defendants' attorneys have opined—in the context of other litigation or in extra-judicial communications—that the professional services exclusion does not apply. But plaintiffs provide no cases or legal theory which indicates I should consider these statements in determining whether the parties have triggered a contract provision.

[29] (Dkt. #13, Ex. 6.) For example, Huynh alleged Mediversal managed the "medical care of insureds/members." (*Id.* at 4.)

[30] (Dkt. #198, Ex. 2, at 2935-2938.)

training and knowledge. Mediversal's activities therefore triggered the professional services exclusion.[31]

### B. Whether Mediversal carried out non-professional services triggering coverage

Finally, plaintiffs argue that even if Mediversal performed some professional services, it also provided some administrative services, which should trigger coverage. Where two causes combine to concurrently harm a party, coverage may exist even if one of the causes was an excluded risk.[32] But the excluded and non-excluded causes must be independent to trigger coverage.[33]

Plaintiffs do not explain how any potential non-professional causes are independent of professional causes. Further, plaintiffs have not submitted evidence or analysis raising a triable issue as to whether Mediversal's non-professional services were a source of liability in the Huynh litigation. The claims leading to Mediversal's settlement involved its healthcare-management service, a professional service.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

---

[31] Notably, plaintiffs likely are not left without a remedy. Mediversal maintained "Third Party Administrator Professional Liability Insurance" that covered "utilization review," credentialing services, and acting as an administrator for single employer benefit plans. (Dkt. #198, Ex. 1, at GW-MED 2071-82.)

[32] *St. Paul Fire & Marine Ins. Co. v. Del Webb Communities, Inc*., No. 12-CV-00674-KJD, 2013 WL 1181904, at *5 (D. Nev. Mar. 19, 2013).

[33] *Id.*

## IV. CONCLUSION

IT IS THEREFORE ORDERED that defendants' motion for partial summary judgment (Dkt. #198) is GRANTED IN PART.  Specifically, I hereby declare that the services that gave rise to Mediversal's liability in the Huynh litigation fell within the professional services exceptions in defendants' insurance policies.

Dated:  January 9, 2015.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE